# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

Case No. 1:14-CV-24137-JLK

TELESTRATA, LLC,

        Plaintiff,

v.

NETTALK.COM, INC.,
ANASTASIOS "TAKIS" KYRIAKIDES,
STEVEN HEALY,
ANASTASIOS "NICK" KYRIAKIDES II,
KENNETH HOSFELD,
GARRY PAXINOS,
KYRIAKIDES INVESTMENTS, LTD.,
SHADRON STASTNEY, and
ANGELA ILISIE,

        Defendants.

_____/

## PRELIMINARY INJUNCTION

THE COURT, having received and reviewed the Motion for a Temporary Restraining Order and Motion for Preliminary Injunction filed by Plaintiff (collectively, the "Motions"), the affidavit and documents attached thereto, Defendants' Response and Plaintiff's Reply, and having conducted an evidentiary hearing on August 3 through 5, 2015, and having reviewed the file and being otherwise advised in the premises, hereby makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

Samer Bishay is a member of Plaintiff Telestrata, and is also its manager.  He is also CEO and co-owner of a company named Iristel, a Canadian telecommunications company. In 2011, Iristel entered into an agreement with Defendant NetTALK, to provide termination

services for calls made by NetTALK customers to Canadian phone numbers, and also to provide phone numbers to NetTALK customers located in Canada.

In approximately May 2013, NetTALK was unable to pay its monthly bills to Iristel for services. Defendant Nick Kyriakides, the Vice President of NetTALK at the time, told Mr. Bishay that NetTALK's largest lender (Vicis Capital) was restructuring and shutting down. In order for NetTALK to have operating capital, Mr. Bishay made two personal loans to NetTALK, one in the amount of $300,000 in June and another personal loan of $200,000 in July 2013. On or about June 27, 2013, Mr. Bishay executed a Letter of Intent with NetTALK, pursuant to which the parties agreed to further negotiate an agreement whereby Mr. Bishay would be granted 68.88% ownership interest in NetTALK, in exchange for agreeing to make certain payments over time to NetTALK totaling up to $3.5 million dollars.

Under the terms of the Letter of Intent, the parties agreed that NetTALK would complete restructuring of the Vicis Capital debt. The Letter of Intent was non-binding, and expired on July 15, 2013. Notwithstanding this provision, NetTALK's CEO, Takis Kyriakides, continued to request capital payments from Samer Bishay after July 15, 2013, and Mr. Bishay continued to invest additional capital.

Between July 15, 2013, and early January 2014, Mr. Kyriakides and NetTALK continued to request and accept the payments, continued to use the funds, and did not inform Mr. Bishay that NetTALK considered the Letter of Intent to be expired. In early January 2014, Mr. Bishay flew to Miami, Florida to NetTALK's offices, and met with the executives for NetTALK. In that meeting, for the first time, NetTALK informed Mr. Bishay of its position that the Letter of Intent had expired, and that Mr. Bishay did not own any interest in NetTALK. As of the time of that meeting, Mr. Bishay had paid cash to NetTALK for operating expenses in the approximate

amount of $1.4 million, and Iristel had deferred collection of amounts due to it from NetTALK for services in the approximate amount of $1.8 million.

After further negotiation, the parties executed a second letter of intent dated February 20, 2014. Under the terms of that second letter of intent, a new company to be formed by Mr. Bishay (Plaintiff Telestrata) would be granted a 48.88% ownership interest in NetTALK, and would further be granted a warrant for an additional 20% ownership interest upon exercise. Between February 20, 2014, and March 11, 2014, the parties exchanged and made changes to drafts of final closing documentation to consummate the deal. On or just prior to March 3, 2014, NetTALK's Chief Financial Officer, Defendant Steven Healy, drafted a "final" capitalization table as of February 28, 2014. This capitalization table contained three columns: the name of each shareholder of NetTALK, the number of shares owned by that individual shareholder, and the percentage ownership interest owned by that individual shareholder. At the bottom of the two-page table, Mr. Healy indicated that the total number of outstanding shares of the Company were 52,048,221 shares.

In the capitalization table, Defendant Healy specifically identified the number of shares (and corresponding ownership percentage interest) of the Individual Defendants, as follows:

- Kyriakides Investments, Ltd. – 18,985,539 shares, 36.477%

- Nick Kyriakides – 2,033,000, 3.906%

- Kenneth Hosfeld & Ana C. Imai – 2,238,000, 4.300%

- Garry Praxinos – 183,000, 0.352%

- Angie Ilisie – 82,000, 0.158%

Mr. Healy also included a single line in the capitalization table, identifying the shareholder as the "2013 Stock Option Plan,"[1] and identifying the 2012 Stock Option Plan owned 10,724,000 shares for a 20.604% interest. Mr. Healy did not indicate in the capitalization table that any of these shares had been granted or allocated to particular individuals. Defendant Shad Stastney, negotiating on behalf of NetTALK and the Defendants, forwarded the capitalization table by email to Mr. Bishay and Telestrata on March 3, 2014. Defendants did not otherwise disclose to Telestrata that any of the shares purportedly contained in the 2012 Stock Option Plan had been granted or allocated to particular individuals.

The Telestrata transaction closed on March 11, 2014, and the Company issued 25,441,170 shares of stock to Telestrata, and issued a warrant to Telestrata to obtain an additional 20% ownership interest upon exercise. NetTALK also executed a Promissory Note in favor of Telestrata for $4,071,939.84. As agreed to in the closing documents, Telestrata appointed three individuals to the Board of Directors of NetTALK. Following the closing, the new Board of Directors for NetTALK issued a warrant to the management employees of NetTALK, pursuant to the closing documents, allowing for the grant of up to a 20% ownership interest upon exercise to the identified individuals. At no time, on or after March 11, 2014, did the Board of Directors consider or vote on any grant of shares to employees of NetTALK, including a purported grant of 9.9 million shares to the Individual Defendants.

In October 2014, the relationship between the parties deteriorated. Telestrata exercised its warrant on October 14, 2015. On October 15, 2014, the Company stated that it would formally issue the shares to Telestrata once it received the executed original warrant from

---

[1] The "2013 Stock Option Plan" listed on the capitalization table actually refers to the 2012 Stock Option Plan, and the parties agree the 2013 date is a scrivener's error. Accordingly, the Court will refer to these 9.9 million shares as being part of the "2012 Stock Option Plan."

Telestrata. On October 16, 2014, the Individual Defendants purported to exercise the management warrant, and immediately issued themselves an additional 24,280,000 shares of stock in the Company.  The Individual Defendants then executed a Written Action of Shareholders dated October 16, 2014, in lieu of a meeting, in which they purported to vote as a majority of shareholders in NetTALK to remove the three directors that had been appointed by Telestrata.  In their signature lines, they purported to exercise rights as owners of the additional 24,280,000 shares based upon the exercise of the management warrant, even though those shares of stock had not yet been issued by the transfer agent for NetTALK to them.

In the written shareholder action, the amount of shares listed as being then-owned by the Individual Defendants was materially different from the number of shares listed in the capitalization table disclosed on March 3, 2014.  Specifically, the share amounts listed as being owned or controlled by Defendants Takis Kyriakides, Nick Kyriakides, Garry Paxinos, Angela Ilisie, and Steven Healy had increased by 9,987,518 shares. Neither NetTALK nor any of these defendants had previously filed any information statement with the Securities and Exchange Commission concerning ownership of these 9.9 million shares, or disclosed such purported ownership to Telestrata. NetTALK filed a copy of this written action of shareholders with the Securities and Exchange Commission on October 17, 2014.

On May 21, 2015, Defendants NetTALK and Shad Stastney purportedly entered into an agreement whereby NetTALK issued 78,250,000 shares of stock to Mr. Stastney, purportedly in lieu of consulting fees owed to him and for services rendered by him as a former member of the Board from 2012 until June 6, 2013. Additionally, on May 21, 2015, Defendants further caused the Company to issue 35,750,000 shares of stock to Defendants Takis Kyriakides, Nick Kyriakides, Paxinos, and Hosfeld, purportedly as compensation for due and unpaid wages. On

May 27, 2015, Defendants Takis Kyriakides and Kenneth Hosfeld (purporting to act as a majority of the Board of Directors of NetTALK) adopted a new 2015 Employee Stock Option Plan, to set aside 60 million shares of common stock for future issuance to employees.

On May 29, 2015, the Individual Defendants (purporting to constitute a majority of shareholders of the Company) executed a written shareholder action to increase the number of authorized shares of the Company from 300,000,000 shares to 1,000,000,000 shares of common stock, and to also create a new preferred class of stock to contain 10,000,000 shares of preferred stock. The shares counted by NetTALK as being owned by the Individual Defendants for this purported written shareholder action included the 9.9 million shares first disclosed on October 16, 2014, as well as the 24 million shares from the exercise of the management warrant, as well as the shares purportedly granted to Shad Stastney on May 21, 2015.

Plaintiff filed its Motion for a Temporary Restraining Order on July 6, 2015, and the Court issued a Temporary Restraining Order on July 7, 2015. Plaintiff filed its Motion for a Preliminary Injunction on July 10, 2015, and Defendants filed their combined Response to the Motion for a Preliminary Injunction and Motion to Dissolve the TRO on July 16, 2015. Plaintiff filed its Reply in support of its Motion for a Preliminary Injunction on July 20, 2015. This Court heard oral argument on the briefs on July 21, 2015, and extended the TRO an additional fourteen days pending an evidentiary hearing scheduled August 3, 2015.

The Court conducted an evidentiary hearing on August 3, 4, and 5, 2015. By the stipulation of the parties, the issues at that hearing were limited to (a) the ownership interest of the parties immediately prior to, and immediately following, the Telestrata transaction on March 11, 2014; (b) the ownership interests in mid-October 2014; and (c) evidence concerning the potential harm to Defendants which would arise from issuance of injunctive relief.

## CONCLUSIONS OF LAW

To obtain a preliminary injunction, a party must demonstrate: "(1) [that there is] a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo,* 403 F.3d 1223, 1225–26 (11th Cir. 2005); *accord Seigel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*).

The goal of a preliminary injunction is to "protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits." *Long v. Benson,* 383 F. App'x 930, 931 (11th Cir.2010) (internal citations omitted); *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1218 (S.D. Fla. 2014) (same). A preliminary injunction is intended to merely "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981); *Canal Auth. of the State of Fla. v. Callaway,* 489 F.2d 567, 573 (5th Cir. 1974).

"Given this limited purpose, a party 'is not required to prove his case in full at a preliminary-injunction hearing' and the 'findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1312 (S.D. Fla. 2008) (quoting *Camenisch,* 451 U.S. at 395).

I.   **Plaintiff has shown it is likely to succeed on the merits of its Fourth Claim for Relief, as well as its Alternative Eighth Claim for Relief.**

Based upon the evidence presented with the Motions, and the sworn testimony and documentary evidence introduced at the hearing, Plaintiff has clearly established that it is likely to prevail as to its Fourth and Eighth Claims for Relief in this action.

**A. Plaintiff is likely to prevail on its Fourth Claim, seeking a declaration that the Individual Defendants do not own the 9.9 million shares purportedly granted to them from the 2012 Stock Option Plan.**

Plaintiff's Fourth Claim for Relief seeks a declaration from the Court that 9.9 million shares purportedly granted to the Individual Defendants from the 2012 Stock Option Plan, as listed on their written shareholder action dated October 16, 2014, are not actually owned by them and were not validly granted to these defendants.

In a case of actual controversy within its jurisdiction, a district court may declare the rights and other legal relations of an interested party seeking such declaration. 28 U.S.C. § 2201. The question of rightful ownership of securities is a proper case or controversy for resolution by a declaratory judgment claim. *Linker v. Custom-Bilt Mach. Inc.*, 594 F. Supp. 894, 901 (E.D. Pa. 1984) (citing *Price v. Rome,* 222 So. 2d 252 (Fla. 3d DCA 1969), *cert. denied,* 226 So. 2d 820 (Fla.1969)).

Based upon the evidence presented, certain facts material to the Fourth Claim are undisputed:

1. The Individual Defendants did not disclose to Telestrata or the SEC, prior to October 17, 2014, that they owned or controlled these 9.9 million shares, as was required by 15 U.S.C. § 78p;

2. NetTALK did not file any information statement with the SEC, prior to October 17, 2014, indicating these 9.9 million shares had been granted or issued to the Individual Defendants;

3. None of the defendants disclosed to Telestrata or its agents, prior to the Telestrata transaction that closed on March 11, 2014, that any grant of these 9.9 million shares had been made to the Individual Defendants from the 2012 Stock Option Plan;

4. Neither Telestrata nor any of the Telestrata-appointed directors voted to grant 9.9 million shares to the Individual Defendants after they ascended to the Board following the March 11, 2014 closing; and

5. Prior to October 17, 2014, Telestrata was not aware that the 9.9 million shares had purportedly been granted and issued to the Individual Defendants.

Defendants called multiple Defendants as witnesses to testify concerning a purported grant of the 9.9 million shares as having occurred in or about December 2013, with the shares not actually being issued until sometime later in March 2014. However, all of these witnesses (except for Takis Kyriakides) testified that they were not on the Board, did not make the decision to grant the shares, and did not have any personal knowledge of the Board's decision or the timing of the grant or issuance of the shares.

Defendants presented a Written Action of the Board purportedly dated December 18, 2013, purporting to state that the shares were granted to the Individual Defendants on or about December 18, 2013. *See* Defendants' Exhibit 7. The Court questions the authenticity and legitimacy of this document. Defendants called Defendant Takis Kyriakides to testify as a Board member that the Board voted to grant the shares prior to the Telestrata transaction. However, Defendant Takis Kyriakides did not initially recall having attended any Board meeting in December 2013 at which a resolution was made to issue the 9.9 million shares to the Individual Defendants, but testified that he recalled a Board meeting occurring on or near March 4, 2014 (which was after Defendants had disclosed the "final" capitalization table to Telestrata, and just

prior to signing the Telestrata transaction). *See* Transcript of 8/5/15, at 56:4 - 57:9. Not only does such testimony contradict the date on the exhibit, such testimony about a Board meeting even occurring contradicts the exhibit itself, which states it was an action *in lieu of* a Board meeting. *See* Defendants' Exhibit 7. Moreover, Mr. Takis Kyriakides then changed his testimony on re-direct concerning the timing of the Board meeting, without explanation. *See* Transcript of 8/5/15, at 62:23 – 64:4.

Further, none of the witnesses called by Defendants offered a reason why a two-and-a-half month delay occurred between the purported granting of the shares in December 2013, and the Company's issuance of the shares in March 2014. No evidence was presented by Defendants to explain why the Company did not instruct the transfer agent to issue the shares until after Defendants disclosed a "final" capitalization table to Telestrata. On the contrary, Defendant Takis Kyriakides testified it was important to issue instructions to the stock transfer agent "immediately" after any grant of stock. *See* Transcript of 8/5/15, at 55:13 – 55:21.

The authenticity and legitimacy of the Written Action of the Board, dated December 18, 2013, is highly suspect in the light of the malleability of Mr. Kyriakides' testimony, and lack of personal knowledge by the other witnesses. The timing of the grant of the 9.9 million shares is a critical issue in this action. The Court is unable to determine based on the limited record before it when the Company actually decided to grant the 9.9 million shares to the Individual Defendants, and cannot determine, on the basis of the record as it now stands following the Preliminary Injunction Hearing, whether the 9.9 million shares were ever properly granted (and the documents related to such grant prepared) before or after the closing of the Telestrata transaction.

Additionally, the Court determines that, because the Company and the Individual Defendants had a legal duty to disclose to the SEC any transfers of stock made to officers and directors, *see* 15 U.S.C. § 78p, the absence of any such filings necessarily gives rise to a presumption that such transfers were not actually made.

Thus, although it is clear that further discovery by both parties may be necessary to develop this issue, based upon the evidence presented at the hearing and in the Motions, the Court believes Plaintiff has sufficiently called into question whether any legal grant of the 9.9 million shares ever occurred prior to the closing of the Telestrata transaction, and that Plaintiff will prevail on that claim.

On the basis of record established during the Preliminary Injunction Hearing, Plaintiff is likely to prevail on its claim that Defendants did not validly own the 9.9 million additional shares, and Plaintiff will also likely prevail on its challenge to the subsequent written shareholder actions taken by Defendants to oust them. Based upon the share numbers and ownership percentages revealed in the documents, all of the purported written shareholder actions taken by Defendants (including the October 16, 2014 written action purporting to remove directors, as well as the written action in May 2015 to authorize 700,000,000 additional shares and a new preferred stock class) were necessarily based upon, and included, the 9.9 million shares Defendants issued themselves in determining the majority calculation. Considering that Telestrata is likely to prevail on establishing that Defendants do not legitimately own and were not legally granted those 9.9 million shares, then all of the subsequent written shareholder actions likewise are invalid, because Defendants' did not own or control a majority of shares without including those 9.9 million shares in their calculations.

**B. Plaintiff is also likely to prevail on its Eighth Claim, for fraudulent inducement.**

Plaintiff's Eighth Claim for Relief asserts a claim for fraudulent inducement, alleging that the Defendants intentionally misstated the ownership capitalization table of the Company in order to induce Telestrata to enter into the transaction believing that the Individual Defendants would no longer own a majority of the company.

"The essential elements of common-law fraud are: (1) a false statement of material fact; (2) known by the person making the statement to be false at the time it was made; (3) made for the purpose of inducing another to act in reliance thereon; (4) action by the other person in reliance on the correctness of the statement; and (5) resulting damage to the other person." *Gandy v. Trans World Computer Tech. Grp.*, 787 So. 2d 116, 118 (Fla. 2d DCA 2001).

During the hearing, Mr. Bishay (the manager and co-member of Telestrata) credibly testified that he had always negotiated with the Defendants concerning the transaction in terms of percentages of ownership, and made clear to them his expectation that Telestrata would own 48.88% of NetTALK following consummation of the transaction on March 11, 2014. He further testified that he never received any disclosure or indication from Defendants that they would retain majority ownership of NetTALK after the transaction, and testified that he never received any disclosure that the Defendants had granted themselves the 9.9 million shares from the 2012 Stock Option Plan just prior to the close of the transaction. Mr. Bishay testified, consistent with his Verified Complaint, that it was a material and important fact that Telestrata would own 48.88% post-closing, and that Defendants would not have majority control post-closing. Further, Mr. Bishay testified that he relied on the percentages in the capitalization table, and that he

would not have consummated the Telestrata transaction on March 11, 2014, had he known that the Defendants had purported to grant themselves 9.9 million additional shares just before closing. The Court finds this testimony of Mr. Bishay to be credible.

By contrast, all of the witnesses for the Defendants affirmatively confirmed that they did not disclose to Telestrata any specific grant of stock to themselves from the 2012 Stock Option Plan. They all testified that, although the existence of the shares was disclosed on the capitalization table, none of them disclosed any grant of shares to themselves, and that the disclosure of their individual ownership interest in the "final" capitalization table *did not include* the 9.9 million shares purportedly granted to them. Further, Defendant Healy (NetTALK's CFO who prepared the capitalization table) testified that he knew he did not include the purported grant of stock in the listings of individual ownership in the capitalization table at the time he prepared it, and that he made the conscious decision not to identify the individual grants in the stock table. Defendants brought forth no documentary evidence showing any other disclosure to Telestrata by them of the purported stock grant of 9.9 million shares.

Based upon this testimony and these facts, Telestrata has clearly shown it is likely to prevail as to this claim.

**II.    Plaintiff has shown it will suffer irreparable harm if injunctive relief is not granted.**

With regard to the second requirement for entry of injunctive relief, Telestrata has likewise established it will suffer irreparable harm if injunctive relief is not granted.

To demonstrate irreparable harm, a movant must show "that the injury cannot be undone through monetary remedies." *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1223 (S.D. Fla. 2014). The irreparable injury claimed "must be neither remote nor speculative, but

actual and imminent." *Id.* (citing *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000)).

Plaintiff has shown that the dilution and potential additional dilution of its ownership interest, and its lack of control over the affairs of the Company, constitute irreparable harm. First, Plaintiff has clearly established that, without injunctive relief, its ownership percentage in the company (and commensurate ability to control or participate in the control of the Company) will be immediately diluted based upon the grants of shares by Defendants to themselves, and that the creation of a new class of shares and issuance of 700,000,000 additional shares of common stock would dilute them even further.

Specifically, if injunctive relief is not granted, Defendants will continue to purport to cause the Company to take various actions under cover of "written shareholder actions by a majority of shareholders." Further, without injunctive relief, over 700,000,000 new shares of company stock will be created and opened for purchase by the public, and a completely new class of stock with unknown rights and abilities will be created. Further, Plaintiff's ownership interest in the Company will be significantly diluted to potentially less than 5% ownership in the Company.

Although courts in Florida have not previously considered the issue, numerous courts in other jurisdictions (both state and federal) have held that substantial changes to the ownership and control of a corporation may constitute irreparable harm, for purposes of injunctive relief.

A controlling interest in a corporation is itself an important and unique interest. *Beztak Co. v. Bank One Columbus, N.A.*, 811 F. Supp. 274, 284 (E.D. Mich. 1992). "[T]he denial of a controlling ownership interest in a corporation," as well as "[c]onduct that unnecessarily frustrates efforts to obtain or preserve the right to participate in the management of a company,"

may constitute irreparable harm. *Wisdom Imp. Sales Co. v. Labatt Brewing Co.,* 339 F.3d 101, 114–15 (2d Cir. 2003).

"[L]oss of a contractual right to manage and control a business may constitute irreparable harm; that monetary damages are an inadequate remedy for such a loss; and that a contractual right to participate in the management and control of a business has intrinsic value in and of itself that may not be adequately compensated by monetary damages." *Gitlitz v. Bellock,* 171 P.3d 1274 (Colo. App. 2007).

Further, irreparable injury has been found in the significant dilution of a party's stake in a business. *See Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.,* 427 F. Supp. 2d 491, 498 (S.D.N.Y. 2006); *accord Street v. Vitti,* 685 F.Supp. 379, 384 (S.D.N.Y. 1988). "Sale of additional shares in [the company] also would threaten plaintiffs with irreparable harm. If additional shares are sold, the rights of innocent third parties will be interposed, endangering plaintiffs' ultimate remedy." *Vitti,* 685 F. Supp. at 384.

Here, Defendants testified and the documents reflect that the current number of authorized shares in the Company is 300,000,000 shares of common stock. According to the documentary evidence attached to the Motions and Defendants' testimony, Defendants seek to authorize (but not yet issue) 700,000,000 additional shares of common stock, as well as create a new class of preferred stock and authorize 10,000,000 shares of that preferred stock. Yet, Defendants also propose to grant themselves unilateral power to subsequently issue this new stock to whomever they choose: under the terms of the purported Amendment to NetTALK's Articles of Incorporation (which Defendants claim was adopted by shareholder consent on May 29, 2015), "these additional shares could be used in the future [by the Board] for various other purposes without further stockholder approval," and that "the future issuance of additional shares

of Common Stock . . . would have the effect of diluting the voting rights and could have the effect of diluting earnings per share and book value per share of existing stockholders." *See* Ex. 5 to Keithley Affidavit, DE 33-6, at 4.

There is no dispute between the parties that Telestrata's ownership interest was diluted by Defendants' purported grant to themselves of 9.9 million additional shares, and the exercise of the management warrant that was improperly calculated. There is likewise no dispute that Telestrata's ownership interest was further diluted by Defendants' purported grant of stock to themselves on May 21, 2015. There is no dispute that, if the additional shares are authorized and fully issued by the Company (for whatever reason), Telestrata's ownership interest will be further significantly diluted, dropping as far as only constituting 4.45% ownership in the company. Given that the ultimate relief Telestrata seeks in this case is a declaration that it owns 68.88% of the Company, which would grant it majority control, such dilution and inability to control the activities of the Company during the pendency of this case constitutes irreparable harm.

**III.    The balance of interests weighs in favor of imposing injunctive relief.**

Concerning the third criterion for imposition of injunctive relief, the Court agrees with Plaintiff's position, that there is little or no evidence of realistic potential harm that will be suffered by Defendants if injunctive relief is granted.

The only harm suggested by Defendants concerned harm to Defendant NetTALK, arguing that it could not authorize the additional 700,000,000 shares and create a new preferred stock class. Thus, at the least, Plaintiff has conclusively shown that the potential harm to the Individual Defendants does not outweigh the harm to Plaintiff.

With regard to the evidence concerning potential harm to Defendant NetTALK, all of the evidence presented by Defendants was based upon speculation, and, further, the Court finds that any harm to Defendant NetTALK would be caused by Defendants' own actions irrespective of the granting of injunctive relief.

In balancing hardships, a court may consider only the potential harm to the non-movant that may be suffered while an injunction is in place, or which would be suffered permanently as a result of the injunction. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 762 F.3d 755, 765 (9th Cir. 2014). Similarly, in considering the potential harm to a non-movant, a court may discount potential harm that would arise due to the actions of the non-movant. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 596 (3d Cir. 2002).

Here, Defendants' witnesses' speculation focused on two potential harms to the Company if it is not permitted to authorize additional shares. The only two potential harms identified by Defendants were a potential loan default, and the inability to offer additional shares to raise capital. Neither of these potential harms override the irreparable harm that would be suffered by Plaintiff. Importantly, Defendants presented no evidence that the injunctive relief requested by Telestrata will in any way impede NetTALK's ability to conduct day-to-day operations, including selling and marketing its product, manufacturing its product, or routing telephone calls.

First, Defendants speculated that NetTALK could be declared in default of a loan to KBM Worldwide if it could not authorize additional shares, because that loan requires NetTALK to hold a certain amount of shares in reserve so that KBM might exercise its conversion rights under that debt. However, Defendants presented no evidence that KBM Worldwide's exercise of its conversion right was imminent; Defendants merely speculated that it could occur. Further, to

the extent NetTALK has exhausted its authorized amount of shares, such exhaustion is necessarily due to the Defendants having granted themselves 114 million shares of stock in May 2015. Further, Defendants did not present any evidence concerning the outstanding balance upon the loan, or why the Company would not be able to timely satisfy the loan by its terms before the conversion right triggered.

Second, Defendants argue that NetTALK requires additional shares to pledge or grant to potential investors, and that without additional authorized shares NetTALK will be unable to raise additional capital and therefore is in danger of going out of business. The Court is not persuaded that entry of injunctive relief will cause this potential circumstance. NetTALK's own investment banker testified that, over the course of three to four years, he was unable to persuade "dozens" of investors from investing in NetTALK, for a multitude of reasons, including its revenue position, management issues, and other issues. None of Defendants' witnesses identified a particular investor or lender who had offered to invest or loan operating funds to the company, but only if these additional shares would actually be authorized. On the contrary, all of Defendants' witnesses on the subject testified that there were no potential investors or lenders on the horizon, and that Defendant NetTALK felt it needed additional authorized shares just in case there might be a prospect to arise at some undetermined time. The Court finds this evidence of potential harm too speculative to be of probative value.

IV.    **Plaintiff has established that it is in the public interest for the Court to enter injunctive relief.**

As to the final criterion, Plaintiff has clearly shown it would be in the public interest to enjoin authorization of additional shares. If the Court were to not enter an injunction and allow the additional shares to be authorized, only to ultimately determine at trial that such authorization

was unlawful, the ownership and control of the Company would be thrust into chaos.  Members

of the public (including investors and lenders) who had purchased the additional authorized

shares or been granted shares would become unwitting casualties of Defendants' actions, through

no fault of their own.  The interest of the public, and the ability to protect the public, comes from

issuing an injunction and making sure that any shares purchased or offered to the public are bona

fide in the first instance, and not stained with any taint due to Defendants' questioned actions.

## V.  Preliminary Injunction Bond.

As required by Rule 65(c), the Court may not impose a preliminary injunction without

considering what amount would be proper to pay costs and damages sustained by a party found

to have been wrongfully enjoined or restrained.  The amount of an injunction bond is a matter

within the sound discretion of the district court. *See Carillon Importers, Ltd. v. Frank Pesce Int'l

Group, Ltd.,* 112 F.3d 1125, 1127 (11th Cir. 1997).

Here, Defendants did not present any evidence concerning the amount of damages they

would suffer if wrongfully enjoined, making it difficult for the Court to calculate the amount of a

bond.  Although Defendants speculated that the enterprise value of NetTALK was approximately

$900,000 and therefore requested at least a $1,000,000 bond, this request is improper because it

presupposes that limiting the number of authorized shares somehow has a direct impact on the

operations and continued viability of the Company, which Defendants have not shown.

Considering the potential costs for preparing for a three-day evidentiary hearing, and

complying with the Court's orders for Defendants' counsel to attend an oral argument hearing

and then a three-day evidentiary hearing before this Court, a bond in the amount of ten thousand

dollars ($10,000) is appropriate.  Plaintiff shall tender a proper surety bond to the Court for its

approval within five days of the date of this order.

## CONCLUSION

Accordingly, it is **ORDERED, ADJUDGED,** and **DECREED** that Plaintiffs' Motion for Preliminary Injunction **(DE 36)** be, and the same is hereby **GRANTED,** as follows:

(1) Defendants Takis Kyriakides, Steven Healy, Kenneth Hosfeld, Garry Paxinos, Nick Kyriakides, Kyriakides Investments Ltd., and Angela Ilisie are hereby **ENJOINED** from exercising any rights related to the additional 9,987,518 shares listed in the October 17, 2014, Schedule 14c information statement filed by NetTALK, and Defendant NetTALK is hereby **ENJOINED** from recognizing any attempts to exercise such stock;

(2) Defendants, their agents, or employees are hereby **ENJOINED** from exercising any rights related to the 114,000,000 shares of common stock that Defendants purported to issue to themselves in May 2015, including exercising any voting rights relating to said shares;

(3) Defendants, their agents, or employees are hereby **ENJOINED** from filing any Amendment with the Florida Secretary of State concerning any amendment to the Articles of Incorporation of the Company, absent written consent of a majority of shareholders including Telestrata, LLC or further order of this Court;

(4) Defendants, their agents, or employees are hereby **ENJOINED** from taking any further action related to the purported authorization or issuance of 700,000,000 additional shares of common stock absent written consent of a majority of shareholders including Telestrata, LLC or further order of this Court;

(5) Defendants, their agents, or employees are hereby **ENJOINED** from taking any further action related to the purported authorization or issuance of a new class of

preferred stock or issuance of 10,000,000 shares of preferred stock, absent written consent of a majority of shareholders including Telestrata, LLC or further order of this Court;

(6) Defendants, their agents, or employees are hereby **ENJOINED** from issuing any shares or rights to purchase shares pursuant to the 2015 Employee Incentive Stock Option Plan purportedly created in May of 2015; and

(7) Defendants Takis Kyriakides, Kenneth Hosfeld, Garry Paxinos, or Nick Kyriakides are hereby **ENJOINED** from taking any further action (either individually or in their capacities as purported executives or directors of the Company) related to issuance, authorization, sale, or purchase of any further shares of stock in the Company, absent further order of the Court.

**DONE AND ORDERED** in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 19th day of August, 2015.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

cc:     All counsel of record